**Westlaw.**

Not Reported in A.2d                                                                                     Page 1
Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

H
Preston v. Chartkoff
Conn.Super.,2004.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Connecticut,Judicial District of Ansonia-Milford.
Richard PRESTON
v.
Michael M. CHARTKOFF d/b/a Branford Life & Casualty Agency, Inc.
No. CV0020071112S.

Jan. 30, 2004.

Snaider Benson A, PC, New Haven, for Richard Preston.
McGrail, Carroll & Faris, P.C, Branford, for Michael M. Chartkoff.
Johnny D. Lee, pro se.
LINDA K. LAGER, Judge.

*1 The plaintiff Richard Preston (Preston) brought this action against the defendant Michael M. Chartkoff d/b/a Branford Life & Casualty Agency, Inc. (Chartkoff) and, by way of his third amended complaint, sought recovery in nine counts claiming negligence, breach of contract, malpractice (professional negligence) and CUTPA. Chartkoff filed an answer to the third amended complaint denying its allegations and setting forth a number of special defenses to the first through sixth counts. The parties waived their right to a jury trial and this case was tried before the court on August 26, 27 and 28, 2003. In lieu of closing arguments, the parties have submitted briefs setting forth their positions regarding the claims and defenses made in this case.[FN1]

> FN1. The last brief was filed with the court on October 31, 2003.

### I. Facts

The court finds the following facts based on the testimony deemed credible and the exhibits submitted into evidence.[FN2] On or about October 9, 1998 (exhibit 33), Preston purchased property located at 36 Platt Avenue (Platt) in West Haven, Connecticut in the name of Eden Land, LLC., a Delaware corporation. Preston, who was beginning a course of study at the Yale Law School, moved into the premises. The Platt property was a single-family home in a distressed condition and in foreclosure at the time of purchase, although it was habitable. Preston sought to hire a contractor to perform some renovation work including replacing the attic area of the home with a full second story, putting on a new roof and replacing gutters, bringing the wiring up to modern standards, replacing bathroom fixtures, repairing the concrete floor of the garage and removing overgrown shrubs and bushes.

> FN2. As the post-trial briefs point out, Preston and Chartkoff testified to widely different version of the salient events. The court has credited their testimony only in part, generally when it appears to be supported by other credible evidence. The court has placed greater weight on the testimony of Johnny Bernard Lee, Sr., the contractor who had dealings with both Preston and Chartkoff, because he had nothing to gain from the outcome of this litigation. The court has drawn reasonable inferences from the testimony and exhibits it deems credible.

Preston contacted Johnny Bernard Lee, Sr. (Lee), who was doing business as J.B. Lee Action Builders Construction Company, after seeing a classified advertisement in the newspaper and hired Lee to perform the Platt renovations after Lee quoted him a figure of $9,000.00, including labor and materials,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to perform all the work that Preston had specified. Preston did not contact any other contractors and had no other bids for the job. Preston drafted a contract (contract I) containing the specific clauses that he desired and that contract was executed on October 23, 1998 (exhibit 1).[FN3] A second contract (contract II), also drafted by Preston and specifying additional exterior and interior work for the additional sum of $2,000.00, was executed on October 31, 1998 (exhibit 2).[FN4]

FN3. Contract I provided for the following work in the interior: (1) Removal of an existing toilet and sink and installation of a new toilet, vanity sink and shower unit in the bathroom. (2) Installation of new kitchen sink pressure/cut off valves and repair of broken plaster on all kitchen walls and ceiling. (3) Installation of new 200 amp panel breaker service box and new electrical outlets, switches and wiring to code. (4) Installation of sheet rock and insulation for covered porch/front door area where damaged by leaking roof and repair of water damaged walls and ceiling around front door. It provided for the following exterior work: (1) removal of all trees and shrubs from yard and around house .(2) Repair roof in covered porch area from leaking. (3) Removal and replacement of all gutters and leaders. (4) Installation of an 11 x 20 foot concrete floor in garage. (5) Installation of new rear garage window. (6) Repair of garage door to working order. (7) Repair of garage lighting and electrical wiring, interior and exterior. (8) Add 15 x 27 foot dormer style shed to second floor containing five 8 x 4 windows. (9) Add new dormer to second floor to match existing dormer with two 8 x 4 windows. (10) Replace existing 8 x 4 window with new one. (11) Vinyl siding of second floor. (12) New gutters and leaders for the second floor. (13) Interior wiring for second floor including electrical wall outlets and three ceiling fixtures and 1/2 drywall on ceiling and walls. (14) Removal of existing interior wall and closet walls on second floor. (15) Installation of matching flooring on second floor where needed.

FN4. Contract II provided for the following additional work in the interior: (1) Construction of a second floor walk-in closet. (2) Installation of sheet rock, electrical outlets and ceiling light in additional dormer space, as well as flooring to match existing flooring. (3) Construction of a bathroom. (4) Installation of baseboard heating elements for second floor (5) Installation of a water heater in basement to replace existing boiler. (6) Removal of wall between covered patio and living room. It provided for the following exterior work: (1) Extension of the northeast dormer. (2) Installation of 8 foot sliding glass window to southwest dormer. (3) Construction of a deck to cover porch-roof area. (4) Installation of vinyl siding for dormer extension.

Both contracts contained clauses requiring that Lee furnish Preston with a surety bond and provide liability insurance (clauses VI and VII). At the time the contracts were executed, neither Lee nor his business was insured and Lee's home improvement contractor license had lapsed. Preston was aware of these facts. According to Preston, he would not permit Lee to begin any work at Platt until he had obtained his license and insurance and a permit had been issued by the City of West Haven. Preston gave Lee money toward the renewal of his license and for liability insurance.

*2 Lee went about obtaining his license renewal and seeking insurance. He originally went to his former insurance agent who referred him to Chartkoff at Branford Life & Casualty in Hamden. Chartkoff was able to obtain liability insurance for Lee with United National Insurance Company (United National) through a wholesale broker known as Agency Intermediaries, Inc. with an effective date of October 30, 1998 (exhibit 4). Chartkoff also took steps to obtain a performance bond in the amount of $9,800.00 by contacting Western Surety Company (Western Surety) on October 24, 1998 (exhibit 23)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 3
Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

and having Lee complete and sign Western's standard form application for bond on October 29, 1998 (exhibit 7). Chartkoff sent to bond application to Western Surety which rejected it. Ultimately, Chartkoff obtained a quote for a bond from Atlantic Surety for a premium in the amount of $980.00.

What happened regarding the performance bond from this point forward is less than clear. Chartkoff maintains that he did not have any contact with Preston concerning the performance bond and that he only spoke with Lee, who told him he would do the job without the bond. Preston maintains that he spoke with Chartkoff in detail about the bond, that he sent Chartkoff a check for $900.00 on November 5, 1998 (exhibit 29) to cover the cost of the bond, although the check was never cashed, and that Chartkoff sent him a letter by facsimile on November 6, 1998 (exhibit 5) regarding the bond. Lee told Preston that he could not get a bond. He remembers that Preston spoke with Chartkoff about the bond. Lee never gave Chartkoff any money to obtain a bond. No performance bond was obtained.

Meanwhile, Lee's initial application for a building permit was turned down because Lee did not have the proper credentials or documentation. In order to obtain a permit for the work specified in contracts I and II, Lee had to register as a home improvement contractor and also had to submit certain drawings. On November 3, 1998, the West Haven building department issued a permit for the removal of the roof only (exhibit 9). The department was still reviewing the drawings and on November 9, 1998 it drew up a list of deficiencies with respect to the drawings that Lee needed to address.

Nonetheless, Lee began to work at the Platt site. There is credible evidence to support the conclusion that he began work even before West Haven issued the roof removal permit.[FN5] On November 10, 1998, an assistant building inspector went to the Platt site and discovered that Lee had performed work in violation of the roof removal permit. A "Stop Order" was issued (exhibit 10) which required Lee to cease work. At the time the stop work order was issued, Lee had done extensive exterior and interior work including removing the roof shingles and the top layer of the roof framing part of the second-floor area, removing an interior wall, working on a bathroom and electrical work.

> FN5. Preston testified that he did not permit Lee to perform any work at Platt other than the removal of some shrubbery before he received confirmation from Chartkoff that a performance bond was going to be in place. According to Preston, he received a fax from Chartkoff dated November 6, 1998 (exhibit 5), a fact Chartkoff vehemently disputes, and Lee started his work a day or two after that. That would have given Lee approximately four days, at most, including a Saturday and a Sunday, before the stop work order was issued. Preston's testimony is not credible and is contradicted by the testimony of Richard Gladwin, the building official, and by Lee that work began before the roof removal permit was issued. Furthermore, Preston's testimony is contradicted by the allegation contained in his complaint that Lee commenced work on November 4, 1998.

When Lee left the Platt site he had covered the roof with a tarpaulin. He returned on a number of occasions at Preston's request to adjust the covering. Nonetheless, leakage occurred and there was significant water damage to the premises and Preston's personal property, much of it recorded on November 20 and 26, 1998 by Preston on a video tape that the court viewed during trial (exhibit 22). Initially, Preston did not hire anyone to secure the premises, but in mid-December he hired another contractor, Ferrucci Construction, Inc., who secured the premises and obtained a permit on January 6, 1999 to rebuild the roof as part of a more extensive proposal, at a cost of $35,000.00, to remove the existing second-floor structure, construct new outside and inside walls, a roof and a deck, and install windows and doors (exhibit 18). Ultimately, Preston decided to raise the roof and turn Platt into a full three-story one-family house.

*3 Other findings of fact will be made specifically in the context of the court's discussion of the legal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 4

Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

claims made by the parties.

## II. Agency

In order to hold Chartkoff liable for any of the causes of action asserted in the complaint, Preston was required to establish, by a fair preponderance of the evidence, that Chartkoff was acting as his agent with respect to obtaining either the commercial liability insurance or the performance bond or both.

There is no question that Chartkoff acted as a broker to procure insurance for Lee. Lee's former Nationwide agent, who no longer wrote commercial liability insurance, referred him to Chartkoff for the express purpose of obtaining commercial liability insurance and a performance bond. Chartkoff then took steps which are within the classic definition of an insurance broker as set forth in *Ursini v.. Goldman,* 118 Conn. 554, 559, 173 A. 789 (1934): He "acts as a middleman between the insured and the insurer. Having secured an order, he places the insurance, in the absence of a selection by the insured, with the company selected by the broker. He is the agent of the insured in negotiating for the policy. As such he owes a duty to his principal to exercise reasonable skill, care, and diligence in effecting the insurance ... (Citations omitted.)." Ordinarily, the broker's duty to use reasonable care to procure the requested insurance runs only to the applicant for the insurance. See 43 Am.Jur.2d Insurance § 113, p. 190. Indeed, as the plaintiff's expert testified, an insurance broker typically would not represent anyone other than the applicant and, under normal circumstances, would have no need to speak with the homeowner in order to procure liability insurance or a performance bond for a contractor.

In procuring insurance for a person, "the broker becomes the agent of that person for that purpose." *Lewis v. Michigan Millers Mutual Insurance Co.,* 154 Conn. 660, 664, 228 A.2d 803 (1967). In order to resolve the question of the nature of Chartkoff's relationship with Preston, the court can be guided by the established rules of agency. See *Hallas v. Boehmke & Dobosz, Inc.,* 239 Conn. 658, 673, 686 A.2d 491 (1997). "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." 1 Restatement (Second), Agency § 1, p. 7 (1958). To establish that Chartkoff was his agent, Preston was required to demonstrate three elements: (1) a manifestation by Preston that Chartkoff was to act for him; (2) Chartkoff's acceptance of the undertaking; and (3) an understanding between Chartkoff and Preston that Preston was to be in control of the undertaking. *Hallas v. Boehmke & Dobosz, Inc., supra,* 239 Conn. at 673.

As to Preston's claims regarding the liability insurance, which are set forth in counts one, four, five, seven and eight, Preston has failed to establish any of these three elements by a fair preponderance of the evidence. It is undisputed that Lee, not Preston, was referred to Chartkoff and that Lee, not Preston, asked Chartkoff to act on Lee's behalf to obtain general commercial liability insurance for Lee's business. Although Preston testified that Lee told him about Chartkoff, gave him Chartkoff's business card and Preston called Chartkoff by that time Chartkoff had already begun the process of obtaining liability insurance on Lee's behalf without any direction from Preston. [FN6] Further, there is no credible evidence that Chartkoff had an understanding with Preston that Preston was to be in control of the process of obtaining liability insurance with respect to any issues, including the nature or adequacy of the coverage. Even if Chartkoff received contracts I and II from Preston before the liability insurance was secured, which Chartkoff denies, any arguable duty Chartkoff may have had arising from a review of those contracts with respect to the nature of the coverage obtained would be to Lee, not Preston. Moreover, in the absence of a special relationship with a client such as an intimate long-term relationship, a broker does not have any duty to advise a client as to the sufficiency or adequacy of insurance coverage. See *The DeHayes Group v. Pretzels, Inc.,* 786 N.E.2d 779 (Ind.App.2003); *Sintros v. Hamon,* 148 N.H. 478, 810 A.2d 553 (2002).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 5
Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

> FN6. There is a considerable dispute regarding when Preston first spoke to Chartkoff about the liability insurance. Preston testified that he spoke with Chartkoff after Lee brought him Chartkoff's business card and that Chartkoff told him he was in the process of obtaining the general liability insurance and he believed there would be no problem in getting it. Chartkoff testified that he did not recall speaking with Preston until after the Platt property sustained damage.

*4 As to Preston's claims regarding the performance bond, which are set forth in counts two, three, four and six, the evidence, although not overwhelming, supports the conclusion that Chartkoff had entered into an agency relationship with Preston. In reaching this conclusion, the court relies heavily on Lee's testimony that Preston spoke with Chartkoff about the performance bond and that Lee did not care if there was a performance bond but Preston was insistent about it. In addition, while Lee never gave any money to Chartkoff for the performance bond, Preston introduced evidence that he wrote a check in the amount of $900.00, close to the amount required to secure the bond, on November 5, 1998 (exhibit 29). Furthermore, although Chartkoff vehemently denies its authenticity, Preston introduced a letter from Chartkoff to him dated November 6, 1998 regarding the procurement of the bond which stated, among other things, "that the performance bond to cover Mr. Lee's work *which you have requested* is currently being placed." (Emphasis supplied; exhibit 5). This evidence supports the conclusion that while Lee may have initially approached Chartkoff regarding the performance bond, it was Preston who took control over the process of having Chartkoff procure the bond and Chartkoff understood that to be the case. Thus, unlike the situation involving the liability insurance, there is a preponderance of the evidence to satisfy the three elements of agency regarding the procurement of the performance bond.

Thus, the court concludes, based on the evidence presented in this case, that Chartkoff was not acting as Preston's agent in the procurement of the liability insurance but he was acting as Preston's agent in the procurement of the performance bond.

### III. Standard for Liability

To the extent that Chartkoff was acting as Preston's agent he owed him a duty "to exercise reasonable skill, care, and diligence in effecting the insurance, and any negligence or other breach of duty on his part which defeats the insurance which he undertakes to secure will render him liable to his principal for the resulting loss. Where he undertakes to procure a policy affording protection against a designated risk, the law imposes upon him an obligation to perform with reasonable care the duty he has assumed, and he may be held liable for loss properly attributable to his default. The principal may sue either for breach of the contract or in tort for breach of duty imposed by it. (Citations omitted.)." *Ursini v. Goldman, supra,* 118 Conn. at 559-60. See *Rametta v. Stella,* 214 Conn. 484, 489, 572 A.2d 978 (1990).

Whether the claim against an insurance broker is brought in contract or tort, the broker's general duty is the same: to act reasonably and without delay to procure the insurance coverage he has promised to obtain and to notify his client promptly if he is unable to procure the requested insurance coverage. [FN7] Harnett, Responsibilities of Insurance Agents and Brokers, § 3.03 (Matthew Bender 2004). The agent breaches his contract to procure the insurance and also acts negligently if he fails to obtain the insurance and fails to notify the client. The agent's breach or negligence then must be established to be a proximate cause of the uninsured loss.

> FN7. The purpose of timely notification is to permit the client to have an opportunity to procure insurance elsewhere. *Baseball Office of the Commissioner v. Marsh & McLennan, Inc.,* 295 A.D. 73, 79-80, 742 N.Y.S.2d 40, 46 (App.Div.2002).

### IV. The Complaint

#### A. Counts One, Five, Seven and Eight

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 6
Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

*5 As the court reads the complaint, counts one, five, seven and eight make claims solely in relation to the liability insurance. The court has concluded that Chartkoff was not acting as Preston's agent with respect to the liability insurance. Accordingly, Chartkoff did not owe Preston any duty to procure the liability insurance.

In counts one and five, Preston makes claims based on Chartkoff's failure to procure adequate liability insurance and, in count seven, Preston claims that Chartkoff negligently failed to inform him that the United National policy did not cover the roof. However, there is no question that through Chartkoff's efforts, on October 30, 1998, which was around the time that Lee commenced his work at Platt, United National issued a general commercial liability policy (exhibit 4) to Lee which provided $100,000.00 in coverage and did not contain a roofing exclusion. Indeed, according to the plaintiff's expert witness, the policy covered claims of damage arising from the work done on the roof. Consequently, the evidence is insufficient to support the allegations of counts one, five and seven.

Thus, even if the court's conclusion that Chartkoff was not Preston's agent is erroneous, Chartkoff would have met any duty he did owe to Preston by obtaining the liability insurance as it covered the loss in question. It is irrelevant to this conclusion that United National refused, initially, to pay Preston's claim against the policy because the law provides that an insurance broker or agent is absolved from liability if he has obtained the coverage requested, notwithstanding an insurer's refusal to pay. See Holmes' Appelman on Insurance 2d, § 83.9; *Harnett, supra,* § 3.03.

In count eight, Preston claims that Chartkoff was negligent in failing to promptly report his claim of damage to United National. The evidence establishes that Chartkoff submitted a notice of claim to United National on December 8, 1998 (exhibit 35), one day after Preston spoke to him about the claim. Accordingly, the evidence refutes the allegations contained in count eight. Moreover, any duty that Chartkoff could have owed Preston would have ended when Chartkoff procured the liability policy. *Lewis v. Michigan Millers Mutual Insurance Co., supra,* 154 Conn. at 664.

Based on the foregoing, the court finds against the plaintiff and in favor of the defendant on the first, fifth, seventh and eighth counts.

B. Counts Two, Three, Four and Six

Counts two, three and six make claims solely in relation to the procurement of the performance bond. In count two, Preston claims negligence in failing to procure a performance bond and, in count six, he claims professional negligence based on the same facts; in count three, he claims negligence in failing to inform him that the performance bond was not procured. In count four, Preston claims that Chartkoff breached his contract with him to procure both the liability insurance and the performance bond but for reasons stated above, the only viable contractual claim in that count concerns the performance bond.

*6 Generally speaking, the duty imposed on an insurance broker to procure insurance, under either tort or contract law, simply requires the broker to act reasonably and without delay to try to obtain the requested coverage, but the broker cannot be held liable for the failure to obtain coverage as long as the client is informed of that fact. "In most cases where courts find that an agent has a duty to procure insurance, the agent has engaged in some type of affirmative conduct sufficient to warrant the client to assume that the desired insurance coverage has been or would be obtained. For example, a statement by an agent to the client that an insurance policy had been or would be procured has often been singled out by the courts as an important liability-imposing factor." Holmes' Appelman on Insurance 2d, *supra,* § 83.1. See Annot. 64 ALR3d 398, § 2[a], 6[a].

In this case, there is no question that Chartkoff acted reasonably and without delay by seeking a performance bond from Western Surety on October 24, 1998, almost immediately after he first met with Lee. When Chartkoff was unable to obtain a performance bond from Western Surety, he then went to other companies and finally obtained a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 7
Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

quotation from Atlantic Surety which was willing to place the bond for a premium of $980.00. At this point, he communicated the information to Lee who indicated he was unwilling to pay that amount of money for the bond and would do without it. As to Lee, Chartkoff was not negligent nor did he breach any contract.

However, in this case Chartkoff assumed an independent duty, both in tort and contract, to Preston based on his conversations with him regarding the performance bond and the representations he made in the letter to Preston dated November 6, 1998. As a result, Chartkoff had a duty to Preston (1) to use reasonable diligence to obtain the performance bond and (2) to notify Preston promptly if he was unable to obtain it. Annot., *supra,* 64 ALR3d 398, §§ 3, 4; *Harnett, supra,* § 3.03. As to (1), the evidence establishes that Chartkoff acted diligently in attempting to obtain a performance bond. As to (2), there is no direct evidence that Chartkoff failed to notify Preston that a bond was not obtainable, rather the only evidence is the letter dated November 6, 1998 which indicates that "another company has agreed to bond Mr. Lee" and the requested bond was "being placed." Consequently, in order to recover for any loss arising out of either Chartkoff's failure to secure a performance bond or failure to advise him that he was unable to procure one, Preston must establish that Chartkoff acted in a manner that "warranted an assumption by the client that he was properly insured." *Breck Construction Co., LLC v. Thomas, Farr & Reeves Agency, Inc.,* 852 So.2d 1151 (La.App.2d Cir.2003); *Batiste v. Security Insurance Group,* 416 So.2d 279 (La.App.), cert. denied, 421 So.2d 909 (1982).

Although it might have been reasonable for Preston to rely on the November 6, 1998 letter and assume that a performance bond was to be in place within a few days after its receipt, the court concludes that it was not reasonable for Preston to assume that Lee's work was protected by a performance bond at the time Lee began work at Platt. As the court concluded above, see text at footnote 5, Lee began working at Platt shortly after the liability insurance was secured and before the permit to remove the roof was issued on November 3, 1998. Preston's conduct in permitting Lee to commence work unbonded is inconsistent with his claimed intent to protect himself through Chartkoff's procurement of a performance bond and can be deemed to constitute not only a waiver of the requirements of contracts, I and II concerning the procurement of a performance bond, but also of any duty Chartkoff may have had to secure the bond. Appelman, *supra,* § 87.2. Cf. *T.G.I. East Coast Construction Corp. v. Fireman's Fund Insurance Co.,* 600 F.Sup. 178, 181 (S.D.N.Y.1985). Indeed, even if Chartkoff had fulfilled his duty to inform Preston, within a reasonable period of time after the November 6, 1998 letter, that he had failed to place the performance bond, it would have been futile for Preston to attempt to secure a bond elsewhere because he had already permitted Lee to begin working at Platt.

*7 Furthermore, it is impossible to conclude on the evidence presented that Chartkoff's failure to either secure a performance bond in the amount of $9,800.00 or inform Preston of his inability to do so was a proximate cause of any damages Preston sustained. It was Lee's direct negligence in performing the work on the roof and second story of Platt that resulted, in part,[FN8] in to subsequent water damage to the Platt property and to Preston's personal belongings. The evidence presented does not permit the court to determine when Lee performed the shoddy work nor to conclude that it was any breach on Chartkoff's part, a finding the court does not make, rather than Preston's implied waiver of the performance bond by permitting Lee to commence work before the bond was obtained, that caused Preston to suffer a loss. Accordingly, even if Chartkoff could be found to have breached a duty in tort or contract to Preston by misleading Preston into believing that a performance bond was in place as early as November 6, 1998 or failing to tell him it was not in place, that breach cannot be found to be a proximate cause of any damages Preston may have sustained.

> FN8. According to Lee, after the stop work order issued on November 10, 1998, he covered the roof of the Platt house with a tarpaulin and it was secure. According to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                 Page 8
Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

Preston, all the damage the Platt property sustained occurred between November 10, 1998 and November 26, 1998 as a result of water coming through an inadequately secured roof. Although Preston had Lee return several times in this period to adjust the tarpaulin, he made no efforts to obtain another professional to cover the roof and did not contact his subsequent contractor, Ferrucci, until after the damage was sustained.

Based on the foregoing, the court finds against the plaintiff and in favor of the defendant on the second, third, fourth and sixth counts.

### C. CUTPA

In the ninth count, Preston claims that Chartkoff violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a, et seq., by, among other things, submitting inaccurate answers in Lee's application for liability insurance coverage, failing to procure the performance bond and failing to inform him that the performance bond was not procured (ninth count, ¶ 20).[FN9] These allegations are also contained in the counts alleging negligence and professional negligence (Counts 1-3, 5-8).

> FN9. Preston's allegation in ¶ 20(h) that the liability insurance did not cover the damage caused by the roofing work was refuted by the evidence.

The court is required to focus on the activities alleged to be violative of CUTPA. *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 492, 642 A.2d 1009 (1995). Because the claims made in this case involve Chartkoff's provision of professional services as an insurance broker, Preston had to establish, by a fair preponderance of the evidence, that Chartkoff's alleged unfair or deceptive acts or practices involved the conduct of the entrepreneurial aspects of Chartkoff's insurance brokerage business. See *Suffield Development Associates Ltd. Partnership v. National Loan Investors, L.P.,* 260 Conn. 766, 780-84, 802 A.2d 44 (2002); *Haynes v. Yale-New Haven Hospital,* 243 Conn. 17, 34, 669 A.2d 964 (1997). Like other professionals, Chartkoff is entitled to immunity for " violations predicated on negligence or malpractice ... because those claims address only competence." *Id.,* 243 Conn. at 35. The entrepreneurial exception is a "specific exception from CUTPA immunity for a well-defined set activities-advertising and bill collection, for example," *Suffield Development, supra,* 260 Conn. at 782, or the solicitation of business. The activities involved here-submitting an application for liability insurance and procuring a performance bond-are not entrepreneurial.

*8 Furthermore, the conduct claimed to be violative of CUTPA does not satisfy any of the three criteria of the "cigarette rule" to qualify as unfair under the statute. Those criteria are: "(1) whether the practice, without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory or other established conduct of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors, or other businessmen)." *Federal Trade Commission v. Sperry & Hutchinson Co.,* 405 U.S. 244-45, n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).[FN10] With respect to the claim that Chartkoff submitted inaccurate answers in Lee's application for liability insurance, even assuming those answers constituted a misrepresentation, Preston's expert stated that an agent had no obligation to go beyond submitting the answers given to him by the applicant in response to the form questions supplied by the insurance company. Any verification of that information is the responsibility of the insurance company. Even if Chartkoff had suspicions about the information submitted, according to Preston's expert, his only obligation would have been to tell the applicant that the insurance company would verify the information and, perhaps, to raise his suspicions with the insurance company. As to Chartkoff's conduct regarding the procurement of the performance bond, any arguable breach of duty in failing to procure the bond or to tell Preston of his failure does not rise to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 9
Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

the level of either the second or third criterion, and the first criterion is clearly inapplicable. Moreover, as discussed above in Section IV.B, the court is unable to conclude that Chartkoff's conduct with respect to the performance bond is a proximate cause of the damages that Preston sustained. See *Abrahams v. Young & Rubicam, Inc.,* 240 Conn. 300, 306, 692 A.2d 709 (1997).

> FN10. It is not necessary to prove all three criteria; a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Cheshire Mortgage Service, Inc. v. Montes,* 223 Conn. 80, 106, 612 A.2d 1130 (1992).

Based on the foregoing, the court finds against the plaintiff and in favor of the defendant on the ninth count.

### V. Conclusion

The court concludes that the plaintiff has failed to establish the claims alleged in his complaint by a fair preponderance of the evidence. Accordingly, judgment shall enter in favor of the defendant on the complaint.

Conn.Super.,2004.
Preston v. Chartkoff
Not Reported in A.2d, 2004 WL 304323 (Conn.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1

Not Reported in F.Supp.2d, 2005 WL 2490353 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Rosenberg v. Cavalry Investments, LLC
D.Conn.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
Steven ROSENBERG, Plaintiff,
v.
CAVALRY INVESTMENTS, LLC, Defendant.
No. 3:03CV1087(RNC).

Sept. 30, 2005.

Joanne S. Faulkner, Law Offices of Joanne Faulkner, New Haven, CT, for Plaintiff.
Jonathan D. Elliot, Sabato Pellegrino Fiano, Kleban & Samor, PC, Southport, CT, for Defendant.

*RULING AND ORDER*
CHATIGNY, J.
\*1 After review and over objection, the Magistrate Judge's recommended ruling (Doc. # 63) is hereby approved and adopted with the following clarifications and additions.

Defendant contends that it is not a consumer reporting agency and thus is not subject to liability under 15 U.S.C. § 1681c(a)(4). (Defendant's Objection to Recommended Ruling ("Objection") (Doc. # 66), at ¶ 3.) Section 1681c(a)(4) prohibits consumer reporting agencies from making reports containing "[a]ccounts placed for collection or charged to profit and loss which antedate the report by more than seven years." The FCRA defines " consumer reporting agency" as a person who " regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f); *see also Redhead v. Winston & Winston, P.C.,* 01 CIV. 11475(DLC), 2002 U.S. Dist. LEXIS 17780, at \*8 (S.D.N.Y. Sept. 20, 2002) (observing that the FCRA distinguishes between consumer reporting agencies and furnishers of information to consumer reporting agencies). There is no evidence in the record to suggest that defendant engages in such activity. Accordingly, based on the current record, defendant could not be held liable under 15 U.S.C. § 1681c(a)(4). This is relevant only insofar as it informs plaintiff's CUTPA claim because, as the recommended ruling states, plaintiff has not asserted an affirmative cause of action under the FCRA. (*See* Recommended Ruling on Motion for Summary Judgment ("Recommended Ruling") (Doc. # 63), at 7-8 n. 3.)

Defendant bases much of its argument for summary judgment on the FDCPA claim on the alleged absence of damages (Objection, at ¶¶ 5-7; Memorandum in Support of Defendant's Motion for Summary Judgment (Doc. # 38), at 12-17). The recommended ruling does not explicitly address this issue in detail but correctly concludes that defendant is not entitled to summary judgment. Under the FDCPA, a debt collector violating any provision thereof can be held liable for actual damages incurred by a plaintiff, statutory damages not to exceed $1000 at the discretion of the court, and costs and reasonable attorney's fees. 15 U.S.C. § 1692k(a); *see also Evanauskas v. Strumpf,* No. 3-00-CV-1106 (JCH), 2001 U.S. Dist. LEXIS 14326, at \*12-19 (D. Conn. June 27, 2001) (observing that actual damages can include damages for emotional distress). A genuine issue of material fact exists regarding whether plaintiff suffered actual damages as a result of defendant's alleged violation of the FDCPA. (*See* Rosenberg Aff. (Doc. # 56), at ¶ 15 (stating that plaintiff was "worried, anxious and sleepless" about his loan application and explaining that plaintiff's mortgage payments are higher than they would have been had his initial refinancing application been approved unconditionally)). Even in the absence of proof of actual damages, plaintiff may qualify for statutory damages. *See* 15 U.S.C. § 1692k(b)(1) (listing factors relevant to a determination of statutory damages as "the frequency and persistence of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                 Page 2

Not Reported in F.Supp.2d, 2005 WL 2490353 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional") Thus, defendant's argument for summary judgment fails.

*2 With respect to the FCRA, defendant alleges that, even if it failed to conduct a reasonable investigation under 15 U.S.C. § 1681s-2(b), plaintiff suffered no actual damages because the adverse credit decision occurred before defendant's duty to investigate arose. (Objection, at ¶ 6.) Liability under the FCRA attaches for both negligent violations, which require a showing of actual damages, *see* 15 U.S.C. § 1681o, and willful violations, for which statutory and punitive damages are available, *see* 15 U.S.C. § 1681n. Willful violations require "conscious disregard" or " deliberate and purposeful" conduct. *Casella v. Equifax Credit Info. Servs.,* 56 F.3d 469, 476 (2d Cir.1995). It is premature to conclude that any alleged failure to investigate was not willful. (*See* Recommended Ruling, at 9 ("The defendant has not offered any evidence regarding what, if anything, it did to investigate the dispute.")). Thus, defendant's argument for summary judgment on the ground of absence of damages under the FRCA also fails (again this is relevant only insofar as it informs plaintiff's CUTPA claim).

So ordered.

*RECOMMENDED RULING ON MOTION FOR SUMMARY JUDGMENT*
MARTINEZ, Magistrate J.
This action arises from the defendant's attempt to collect and report to credit agencies a debt it attributed to the plaintiff. The plaintiff alleges that the defendant violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 and the Connecticut Unfair Trade Practices Act (" CUTPA"), Conn. Gen.Stat. § 42-110a. Pending before the court is the defendant's motion for summary judgment. (Doc. # 37.) For the following reasons, the court recommends that the motion be DENIED.

I. *FACTUAL BACKGROUND*

The following facts are undisputed. The defendant Cavalry Investments, LLC ("Cavalry") is in the business of purchasing and collecting portfolios of indebtedness. (Def's. Local Rule 56(c)(1) Statement at ¶ 1.) As part of such a portfolio purchase, Cavalry acquired an account from Fleet Bank in or about December 2001. (*Id* . at ¶ 2.) In September 2002, Cavalry reported the debt to the three national credit bureaus-Experian, Equifax and Trans Union. (*Id.* at ¶ 5.) Cavalry reported that the debt at issue belonged to the plaintiff and that the "opening date" of the account was December 2001, the approximate date that Cavalry had acquired the account from Fleet Bank. (*Id.* at ¶ 6.)

On April 23, 2003, the defendant wrote a letter to the plaintiff seeking to collect the debt. (*Id.* at ¶ 4; Affidavit of Steven Rosenberg ("Rosenberg Aff.") at ¶ 10.) The letter indicated that the debt was owed by the plaintiff's "client," not the plaintiff. (Rosenberg Aff., Ex. 1.) At about the same time, the plaintiff sought to refinance the mortgage on his residence with the help of a mortgage broker. (Def's. Local Rule 56(c)(1) Statement at ¶ 7; Rosenberg Aff. at ¶ 14.) The mortgage broker reviewed the plaintiff's credit report and noted the defendant's report of the former Fleet account. (Def's. Local Rule 56(c)(1) Statement at ¶¶ 7-8.) The proposed loan was approved, but subject to the condition that the plaintiff pay the outstanding debt. (*Id.* at ¶ 10.) The plaintiff-denying that he owed any money-refused to pay. (Rosenberg Aff. at ¶¶ 13-14.) He did not receive the loan. (*Id.* at ¶ 14; Def's Local Rule 56(c)(1) Statement at ¶¶ 11-12.)

*3 On May 2, 2003, the plaintiff sent a letter to the defendant disputing the debt. (Def's Local Rule 56(c)(1) Statement at ¶ 13; Rosenberg Aff. at ¶ 13.) On May 7, 2003, the plaintiff's counsel followed up with a letter requesting that the defendant remove its notation from the plaintiff's credit report "immediately" and indicating that "the alleged debt, if any, is at least a dozen years old." (Def's Local Rule 56(c)(1) Statement at ¶ 14.) On or about May 20, 2003, the plaintiff submitted a dispute form to Equifax. (Affidavit of Al Cole (" Cole Aff.") at ¶ 5; Def's Local Rule 56(c)(1) Statement at ¶ 17.) The dispute form indicated that it was a "rush" request. (Def's Local Rule 56(c)(1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d																																				Page 3
Not Reported in F.Supp.2d, 2005 WL 2490353 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

Statement at ¶ 17.) Equifax transmitted the form to the defendant with a request to confirm the "date of last activity" and the "opening date" of the account. (Cole Aff. at ¶ 7.) The defendant responded that the debt was "verified as reported." (*Id.* at ¶ 8; Def's Local Rule 56(c)(1) Statement at ¶ 17.) The defendant did not provide to Equifax either the date of last activity or the opening date. (Cole Aff. at ¶ 8.) On May 21, 2003, Equifax requested this information again, but the defendant did not respond. (*Id.* at ¶¶ 8-9.) As a result, Equifax removed the entry from the plaintiff's Equifax file on June 17, 2003. (*Id.* at ¶ 9.)

On July 7, 2003, the plaintiff's mortgage was approved with no conditions. (Def's Local Rule 56(c)(1) Statement at ¶ 27.) By this time interest rates had risen. (Rosenberg Aff. at ¶ 15.) Plaintiff elected not to close on the loan, instead waiting to obtain a more favorable interest rate. (*Id.* at ¶ 28.) As of July 30, 2003, the notations regarding the Fleet account were deleted from the plaintiff's credit report with Trans Union and Experian. (*Id.* at ¶ 23.) Ultimately, in September 2003, the plaintiff closed on a new mortgage loan. (*Id.* at ¶ 29.) This action, in which the plaintiff challenges the accuracy of the defendant's information, followed.

### II. *SUMMARY JUDGMENT STANDARD*

A party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of showing the absence of any genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A party opposing a .. . motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.' " *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) (quoting *Celotex,* 477 U.S. at 324). The court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000).

### III. *DISCUSSION*

*4 The defendant argues first that it is entitled to summary judgment on the plaintiff's FDCPA claim because the "plaintiff is incapable of raising any genuine issue of material fact as to the accuracy" of the information the defendant reported or verified. (Def's Mem. at 11.) Defendant contends that during discovery plaintiff disavowed any personal knowledge regarding the details of the debt and he should not be allowed to dispute those details now. In response, the plaintiff contends that he lacks personal knowledge regarding the details of the debt because the debt was not his. Thus, plaintiff argues, there is a genuine issue of material fact regarding whether the defendant violated the FDCPA by reporting this debt and attributing it to the plaintiff. In support, the plaintiff submitted his affidavit in which he avers that the account the defendant reported did not belong to him and that he did not owe the debt. (Rosenberg Aff. at ¶¶ 3, 16-17.) As further evidence, the plaintiff points the court to the documents the defendant produced in discovery that indicate that the account at issue belonged to a Steven Rosenbert-not to the plaintiff. (*See* Exhibits to Affidavit of Joanne Faulkner.) In addition, the defendant's first collection letter to the plaintiff stated that the debt belonged to the plaintiff's "client, " not the plaintiff. (Rosenberg Aff., Ex. 1.)

Under the FDCPA, a debt collector may not misrepresent "the character, amount or legal status of any debt," 15 U.S.C. § 1692e(2)(A), or communicate credit information "which is known or which should be known to be false. "15 U.S.C. § 1692e(8). On the record before the court, the court cannot discern whether (1) the account belonged to the plaintiff, (2) the plaintiff owed a debt or (3) the defendant should have known that the plaintiff did not owe the debt. Therefore, the defendant's motion for summary judgment should be denied on that ground.

Defendant also contends that summary judgment should be granted because it merely reported dates

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 4
Not Reported in F.Supp.2d, 2005 WL 2490353 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

to the credit agencies in accordance with the information it was given by Fleet Bank. In opposition, plaintiff argues that the debt was too old to report in the first instance and the defendant should not have provided any information to the credit agencies. "Under 15 U.S.C. § 1681c, consumer reporting agencies are prohibited from reporting adverse credit information which antedates the report by more than seven years." *Lendino v. Trans Union Credit Information Co.,* 970 F.2d 1110, 1111 (2d Cir.1992); 15 U.S.C. § 1681c(a)(4).[FN1]

>  FN1. The seven-year period referred to in the statute commences "upon the expiration of the 180-day period beginning on the date of the commencement of the delinquency which immediately preceded the collection activity, charge to profit or loss, or similar action." 15 U.S.C. § 1681c(c)(1). Because the underlying dates of delinquency, collection activity and charge off are unclear based on the record, the court is unable to further apply this statutory section.

The parties have presented conflicting evidence as to the age of the debt. The defendant offers a copy of a document that it purportedly received from Fleet Bank which appears to indicate that Fleet charged off the debt on November 18, 1997. *See* Affidavit of Steven Anderson ("Anderson Aff.") at ¶ 5. The plaintiff offers his affidavit in which avers that he never had any dealings with Fleet. (Rosenberg Aff. at ¶ 3.) The court is unable to determine based on the current record whether the debt was more than seven years old.[FN2] Therefore, a genuine issue of material fact exists regarding whether the defendant violated 15 U.S.C. § 1681c(a)(4) by reporting a debt that was too old.

>  FN2. There is additional evidence in the record which implies that the debt, to the extent it existed at all, could have been significantly more than seven years old. For example, plaintiff testified at his deposition that approximately ten years

before the events in this lawsuit occurred, he received a telephone call from a debt collector purportedly seeking to collect a debt on behalf of Fleet Bank. (*See* Exhibit A to Affidavit of Sabato Fiano ("Fiano Aff.") at 15.) After plaintiff denied that he owed such a debt, the debt collector informed him that the debt arose out of an account he had with NatWest Bank in the 1970s (and that Fleet had since acquired NatWest). (*Id.* at 15-21.) In his affidavit, plaintiff indicates that he closed this bank account with NatWest sometime in the 1980s, and that he did not owe any money to NatWest when he stopped banking there. (Rosenberg Aff. at ¶¶ 5, 7.) Further suggestion that the debt was extremely old comes from a document that defendant allegedly received from Fleet when it acquired the debt. That document seems to indicate that the original loan was active as early as August 26, 1976. (Anderson Aff., Ex. 1.)

*5 The defendant next argues that summary judgment should be granted because its investigation of the dispute was adequate and the plaintiff has failed to demonstrate any cognizable damages arising out of his allegation that the defendant violated the Fair Credit Reporting Act ("FCRA"). In response, the plaintiff argues that the defendant violated the FCRA, and therefore CUTPA,[FN3] because it failed to conduct a reasonable investigation after the plaintiff disputed the debt. According to the plaintiff, had the defendant properly investigated its records it would have learned that it could not verify the date of last activity or the opening date (which had been requested by Equifax). This, in turn, "would have averted the unfortunate consequences incurred by plaintiff, since Equifax would have been mandated to delete" the entry from plaintiff's credit report. (Pl's Opp'n to Mtn for SJ (doc. # 54) at 12.)

>  FN3. The plaintiff asserts in Paragraph 1 of his Complaint that he "seeks relief" pursuant to the FCRA. Although he has not asserted an affirmative cause of action

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 5
Not Reported in F.Supp.2d, 2005 WL 2490353 (D.Conn.)
**(Cite as: Not Reported in F.Supp.2d)**

based on the FCRA (Count One asserts a violation of the FDCPA, Count Two asserts a violation of CUTPA), whether the defendant violated the statute-an important statement of public policy-is at least relevant to whether the defendant's actions amount to a violation of CUTPA. A central element in the analysis under CUTPA is " [w]hether the practice ... offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness." *Associated Investment Co. Limited Partnership v. Williams Associates IV,* 230 Conn. 148, 155, 645 A.2d 505 (1994).

The FCRA requires "furnishers" of information to credit reporting agencies, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of its records to determine whether the disputed information can be verified. 15 U.S.C. § 1681s-2(b); *Johnson v. MBNA Am. Bank NA,* 357 F.3d 426, 431 (4th Cir.2004); *McMillan v. Experian,* 170 F.Supp.2d 278, 283 (D.Conn.2001). Generally, it is a question of fact for the jury as to whether a reasonable investigation was conducted. *Akalwadi v. Risk Management Alternatives, Inc.,* 336 F.Supp.2d 492, 510 (D.Md.2004); *Bruce v. First U.S.A. Bank, N.A.,* 103 F.Supp.2d 1135, 1143 (E.D.Mo.2000) (citing *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3rd Cir.1997); *Henson v. CSC Credit Services,* 29 F.3d 280, 287 (7th Cir.1994)).

The defendant has not offered any evidence regarding what, if anything, it did to investigate the dispute. Instead, the defendant argues that even if the date of last activity was May 1997 and not November 1997, "that date would have permitted reporting of the relevant account information for seven (7) years thereafter, until May 2004." Defendant's argument misses the point. Whether the defendant's reporting of the debt ultimately was correct-an issue that is not clear based on the current record-the defendant violated the Fair Credit Reporting Act if it failed to conduct a reasonable investigation in accordance with 15 U.S.C. § 1681s-2(b). Defendant has failed to sustain its burden of proving that it is entitled to summary judgment on this issue.

There are genuine issues of material fact regarding the plaintiff's claims under the FDCPA and the FCRA. These disputed issues of fact preclude summary judgment on the plaintiff's CUTPA claim which, as the defendant correctly notes, is based on those same alleged violations of the FDCPA and FCRA. (Def's Mem. of Law in Supp. of Mtn for SJ (doc. # 38) at 19.) For these reasons, the court recommends that defendant's motion for summary judgment be denied.

### IV. *CONCLUSION*

*6 For these reasons, the court recommends that the defendants' motion for summary judgment (doc. # 37) be DENIED.

Any party may seek the district court's review of this recommendation. *See* 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within ten days after service of same); Fed.R.Civ.P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992) (failure to file timely objections to Magistrate Judge's recommended ruling waives further review of the ruling).

SO ORDERED at Hartford, Connecticut this 29th day of August, 2005.

D.Conn.,2005.
Rosenberg v. Cavalry Investments, LLC
Not Reported in F.Supp.2d, 2005 WL 2490353 (D.Conn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.